725 A.2d 1027

BOARD OF PHYSICIAN QUALITY ASSURANCE

v.

Leon R. LEVITSKY, M.D.

No. 34, Sept. Term, 1998.

Court of Appeals of Maryland.

Jan. 13, 1999.

Reconsideration Denied March 5, 1999.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Thomas W. Keech, Asst. Atty. Gen., on brief), Baltimore, for petitioner.

John A. Austin, Towson, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

In a Final Opinion and Order dated July 30, 1997, the Board of Physician Quality Assurance found that respondent, Leon R. Levitsky, had violated two provisions of the Maryland Medical Practices Act—abandonment of a patient and failure to meet appropriate standards for the delivery of medical care—and revoked his license to practice medicine. The Circuit Court for Prince George's County, acting on Dr. Levitsky's petition for judicial review, reversed the Board's order upon a finding that the peer review process that occurred prior to the filing of charges against Dr. Levitsky was not conducted in strict compliance with procedural requirements governing that process. In reaching that conclusion, the court followed the decision of the Court of Special Appeals in *Young v. Board of Physician,* 111 Md.App. 721, 684 A.2d 17, *cert. granted,* 344 Md. 568, 688 A.2d 447, *cert. dismissed,* 346 Md. 314, 697 A.2d 82 (1997). We granted the Board's petition for *certiorari* before argument in the Court of Special Appeals to consider whether the irregularities alleged or shown in this case suffice to invalidate the Board's final order. We shall conclude that they do not and therefore shall reverse the judgment of the circuit court.

## BACKGROUND

Before delving into the relevant facts and procedural history, we think it helpful to summarize the process used by the Board to investigate and adjudicate complaints made against physicians. That process is governed by the Maryland Medical Practices Act (Maryland Code, title 14 of the Health Occupations Article), regulations adopted by the Board that are codified in COMAR 10.32.02, and a Peer Review Handbook for Maryland adopted jointly by the Board and the Medical and Chirurgical Faculty of Maryland (Med Chi) in 1989.

When an allegation that may constitute grounds for disciplinary action against a physician comes to the Board's attention, the Board is required to conduct a preliminary investiga-

tion. § 14–401(a). Unless, as a result of that investigation, the Board elects not to proceed further, it is required to refer to Med Chi, "for further investigation and physician peer review," any allegation involving standards of medical care. § 14–401(c)(2). Med Chi may delegate the matter to a medical review committee but is required, within 90 days, to make a report to the Board. The report is to contain the information and recommendations necessary for appropriate action by the Board. § 14–401(e).

The peer review process is governed by the Peer Review Handbook. Although there is no reference to the Handbook in either the statute or the Board's regulations, a preface to it states that the Handbook was adopted by the Board as "its required administrative procedure for investigation in the State of Maryland." Chapter III of the Handbook states that Med Chi "conducts its investigation in accordance with the protocols in the Peer Review Handbook."

The Handbook calls for the President of Med Chi, annually, to appoint a Peer Review Management Committee with responsibility, among other things, to receive cases from the Board, identify the guidelines to be used in conducting a peer review, refer cases from the Board to an appropriate medical review committee, review reports received from the medical review committee to assure that the review and report were conducted and prepared in accordance with the Handbook guidelines, and to transmit proper reports to the Board. In cases where the peer review is of a physician's *practice*, rather than of an individual incident, the medical review *committee*, after determining whether the physician's records are sufficiently legible to proceed, may appoint a medical review *team*, consisting of at least two physicians, only one of whom need be a member of the medical review committee. Those physicians, on the medical review team, must examine the records of at least ten patients. Each member of the team must review all ten records and complete an Initial Medical Record Assessment Worksheet, in the form attached as an Appendix to the Handbook, for each record reviewed. Following an office visit, the medical review team, individually or jointly, must

write a report for consideration by the medical review committee.

The medical review committee is directed to gather whatever pertinent information is needed to form a clear picture of the physician's present practice, and the Handbook describes a number of ways in which the committee may obtain that information. The committee must meet with the review team to discuss the office review report, and, if the committee or the team has a concern about the physician's practice, the committee must meet with the physician. In that regard, Chapter XI, ¶ C.13 of the Handbook provides, in relevant part:

"The physician should be asked to provide copies of his/her records to the committee at least one week before the meeting so that members have an opportunity to review them. **It is the responsibility of committee members to review records before attending the meeting to be prepared to ask pertinent questions of the physicians under review.** The records requested by the committee should include those reviewed by the review team....

In reviewing the records, the members of the committee shall use the Initial Medical Record Assessment Worksheet ... to make notes about the record which can be used in discussing the case with the physician under review and in preparing the report for the [Board]."

The medical review committee prepares a report to the Board, which it forwards to the Peer Review Management Committee for transmission to the Board.

Upon receipt of the Med Chi report, the Board determines whether there is reasonable cause to charge the physician with a failure to meet appropriate standards of care. COMAR 10.32.02.03B. If it files a charge, the Board refers the matter to an administrative prosecutor for prosecution and sends notice to the physician. COMAR 10.32.02.03C. Unless the case is resolved through a case resolution conference or an offer by the physician to surrender his or her license, an evidentiary hearing is held either before the Board or before an administrative law judge (ALJ) from the Office of Adminis-

trative Hearings. § 14–405; COMAR 10.32.02.03E. If the matter is tried before an ALJ, as it was in this case, the ALJ issues findings of fact, conclusions of law, and a proposed disposition, to which the physician or the administrative prosecutor may except. After a hearing on any exceptions, the Board issues an order containing the accepted findings of fact and conclusions of law and a disposition. That order is then subject to judicial review in accordance with the Administrative Procedures Act (Maryland Code, title 10, subtitle 2 of the State Government Article).

This case proceeded in accordance with that general format. In October, 1993, the Board received an Adverse Action Report from Doctors' Community Hospital in Prince George's County stating that Dr. Levitsky (1) was unavailable on the day that a patient of his was admitted and continued to be unavailable during that patient's hospital stay, and (2) had been abusive to nursing and laboratory personnel. Although the text of the Action Report is not in the record before us, it appears from a description of it that numerous complaints had been filed with the hospital's medical quality assurance committee and that, as a result, the hospital had suspended Dr. Levitsky's privileges for six months, with reinstatement subject to certain conditions. After a preliminary investigation, the Board referred the matter to Med Chi for further investigation and peer review. In January, 1994, the Board subpoenaed and turned over to Med Chi medical records relating to eleven of Dr. Levitsky's patients.

Med Chi's Peer Review Management Committee referred the matter to a medical review committee of six physicians which, in turn, designated a medical review team, consisting of Drs. Mel P. Daly and John Kelly, to review the patient records. In July, 1994, Dr. Daly rendered a written report to the medical review committee, in which he summarized in general terms both the outpatient and inpatient records. He stated that he had reviewed each patient's record separately, and he concluded that "all of the records reviewed revealed potentially serious deficiencies in patient care." Dr. Daly did

not, however, complete the Initial Medical Record Assessment Worksheet called for by Chapter XI, ¶ C.8 of the Handbook.

Dr. Kelly made a separate report in August, one page of which is missing from the record. In his general comments, Dr. Kelly noted that Dr. Levitsky's handwriting was illegible, thereby making it nearly impossible to identify from the progress notes his thought processes or even his presence. Dr. Kelly pointed out, however, that in none of the cases was there an adverse event or outcome. He concluded that Dr. Levitsky's record keeping was "less than satisfactory," but because there was no adverse medical result, it was difficult for him to address the standard of care issue. Unlike Dr. Daly, Dr. Kelly completed an Initial Medical Record Assessment Worksheet with respect to each patient.

In December, 1994, the medical review committee met. According to the committee's report, Dr. Kelly and Dr. Daly "reviewed each of the medical records for the eleven patients." Dr. Kelly "commented individually on the patient records," and Dr. Daly "presented his review in the form of a written commentary, not always addressing the findings for each patient." In later testimony, Dr. Daly confirmed that he had read each of the records and that Dr. Kelly had "independently reviewed the same charts." Although he was not certain whether the members of the medical review committee reviewed all of the medical records, he was sure that they had read the reports and that "they were knowledgeable enough that they could discuss each of the patients because we discussed each patient, one at a time." The committee also heard from Dr. Levitsky and his attorney, who attended the first part of the meeting; the committee questioned Dr. Levitsky and allowed him to ask questions. In January, 1995, the committee's report was transmitted by the Peer Review Management Committee to the Board. It stated that "the standard of care was not met in the documentation of any of the eleven patient records reviewed" and that "the medical care was inadequate in five of the patient records reviewed."

Upon that report, the Board, in July, 1995, filed charges accusing Dr. Levitsky of (1) abandoning a patient, in violation of § 14–404(a)(6), and (2) failing to meet appropriate standards as determined by appropriate peer review for the delivery of quality medical and surgical care, in violation of § 14–404(a)(22). The charges alleged general deficiencies in the patient records kept by Dr. Levitsky and specific deficiencies in the records of six of the eleven patients, one being the patient allegedly abandoned by Dr. Levitsky.

Hearings commenced before an ALJ on December 4, 1995 and continued for two more days in December, three in February, and one in March. The State's case consisted principally of the testimony of Dr. Daly and the charts and records pertaining to the six patients who were the subject of the charges. Dr. Daly's testimony was interrupted by three witnesses for Dr. Levitsky taken out of turn. At Dr. Levitsky's request, the February and March hearings were moved from the Office of Administrative Hearings to Prince George's County for the convenience of the many witnesses he said that he intended to call. None of those witnesses were called, however. Dr. Levitsky used the hearings on February 15, 28, and 29 and on March 1 for his own extensive testimony. On March 6, 1996, Dr. Levitsky's attorney sent notice to Levitsky of his intention to withdraw from the case and advised Levitsky to obtain another attorney. The record indicates that the attorney withdrew because of an unresolved fee dispute, possibly involving other litigation. The ALJ was not informed of the withdrawal until March 14. On March 26, the ALJ rescheduled further hearings to commence April 9 and extend, with some breaks, through April 23.

On March 28, Dr. Levitsky asked for a postponement until April 22, noting that he was then without counsel. The ALJ denied that request on the ground that the doctor had been aware of his lawyer's intention to withdraw since at least March 6. When the hearing resumed, as scheduled, on April 9, Dr. Levitsky was still without an attorney. The purpose of the hearing was to proceed with the balance of Dr. Levitsky's case, namely, the testimony of the 23 witnesses he indicated

that he intended to call. None of those witnesses were present, however, and considerable argument erupted over the circumstances of the attorney's withdrawal, Dr. Levitsky's readiness to proceed, and why none of the witnesses were available. The ALJ once again refused to postpone the hearing, even for two hours, and, when Dr. Levitsky confirmed that he had no witnesses immediately available, she declared the case closed and proceeded with closing statements.

On July 5, 1996, the ALJ filed with the Board a Proposed Decision, setting forth her findings of fact, conclusions of law, and a proposed disposition. On the basis of 122 specific findings of fact, the ALJ concluded that (1) Dr. Levitsky's outpatient records were "woefully inadequate and failed to detail the ongoing care and the purpose for that ongoing care" and that, by failing to provide a historical record of treatment, they failed to meet the required standard of care, (2) the admission histories in the inpatient records were cursory and lacked sufficient information regarding the patient's medical condition, (3) Dr. Levitsky failed to write sufficient progress notes with respect to his hospitalized patients, and (4) his discharge summaries were also lacking in sufficient detail. She declared those records "worthless." Patient E, she found, had been abandoned. That person became Dr. Levitsky's patient on August 30, 1993, the day following his admission, but he was not visited or examined by Dr. Levitsky for 10 days. For four days, Dr. Levitsky was in South Carolina and received and sent messages concerning the patient through a bartender. Although noting that Dr. Levitsky had been a practicing physician for 40 years, the ALJ concluded that he had failed to provide his patients with competent medical care, and she recommended that his license be revoked.

In August, Dr. Levitsky, through new counsel, filed 56 pages of exceptions to the ALJ's recommended decision. He complained that (1) by proceeding with the hearing on April 9, 1996, the ALJ deprived him of his right to counsel and his right to a full hearing, (2) by limiting his time for closing statement to 45 minutes, she deprived him of his right to make a closing argument, (3) the ALJ was discourteous to and

biased against Dr. Levitsky, (4) the proposed sanction was excessive, and (5) the evidence was insufficient to sustain the two charges in various respects. Attached to the exceptions were a number of exhibits, including 20 affidavits—14 from physicians attesting to the sufficiency of Dr. Levitsky's medical records and patient care and six from lay witnesses with respect to care given to patients by Dr. Levitsky. The administrative prosecutor responded to the exceptions and objected to Dr. Levitsky's attempt, through the affidavits, to put before the Board evidence never presented to the ALJ. Both sides further argued their positions at an exceptions hearing conducted by the Board. As noted, the Board, on July 30, 1997, issued its Final Opinion and Order adopting the findings, conclusions, and proposed disposition of the ALJ.

Dr. Levitsky petitioned for judicial review in the Circuit Court for Prince George's County and, in connection with his complaint that the ALJ had precluded him from presenting evidence on April 9, asked the court to order the Board to take additional testimony. Additionally, he asserted that "it may become necessary for this court to remand these proceedings for a determination as to whether the proceedings before the [Board] complied with the requirements established in the case of *Young v. BPQA*, 111 Md.App. 721, 684 A.2d 17 (1996) ... with respect to the conduct of the peer review process that formed the basis for the charges that were ultimately brought against [Levitsky]...." In that regard, he averred that the record "plainly establishes" that the peer review process was not conducted in accordance with the Peer Review Handbook, and he asked that the court either determine the matter on its own or remand for the Board to make that determination.

The court decided the case on the basis of that alternative argument, finding a number of violations of what it regarded as Board regulations. The court characterized Dr. Kelly's report as a " 'stream of conscious' evaluation of Dr. Levitsky's fitness for practice and not a case-by-case analysis as required by the Board's regulations," and it found that only Dr. Daly had completed the Initial Medical Record Assessment Work-

sheet for each patient reviewed, as required by the Handbook.[1] The court declared that "Board regulations ... mandate independent review of all patient files by the members of the [medical review committee] prior to making its determination," implying that that had not been done, and it found that "no member of the panel complied with the Agency regulations requiring the completion of the Initial Record Assessment Worksheet."

Observing that in *Young, supra,* the Court of Special Appeals had vacated an adverse Board ruling against a physician because the peer review process was not conducted in accordance with the requirements in the Handbook, the court stated:

> "The facts presented before this Court do not differ in any significant way from those in *Young.* Only one of the nine members of the peer review panel, Dr. Daly, completed the Initial Record Assessment Worksheet. Seven of the nine panel members did only a cursory review, if any, of the patient files and instead relied on Drs. Daly and Kelly's summary presentation of their own views of those files."

Upon those findings, the court concluded that "Med–Chi's failure to follow the Board's mandatory guidelines" violated Dr. Levitsky's due process rights. It therefore remanded the case to the Board "for strict compliance with Handbook regulations at the medical investigation and Peer Review stages of this proceeding." That directive, we assume, was influenced by the court's further finding that "the subsequent procedural stages (the administrative hearing, the Board review, and exceptions hearing) may have been tainted by the procedural flaws at the previous stages." Its order vacated the Board's order revoking Dr. Levitsky's license and remanded the case to the Board for further proceedings. Those proceedings

---

1. It appears that the court mistook Dr. Kelly for Dr. Daly. Dr. Kelly did discuss each patient in his report and did attach an Initial Medical Record Assessment Worksheet for each patient. It was Dr. Daly's report that was the more general and did not have appended the assessment worksheets.

were to commence with the peer review, the court concluding that the Board could, if it chose, use the same patient files and peer review committee. Following the report of the peer review committee, a hearing was to be conducted before the same ALJ who had conducted the earlier hearing, although the court stated that "[t]o the extent that the Board's new recommendation, is consistent with its previous recommendation all of the previous testimony presented ... at the prior ALJ hearing may be admitted at the new hearing provided that Dr. Levitsky be given an opportunity to present any evidence that he did not present at the previous hearings."

## DISCUSSION

### Motion To Dismiss

Before addressing the issue we granted *certiorari* to consider, we must deal with Dr. Levitsky's motion to dismiss this appeal. It shall not detain us long. He argues first a combination of mootness and acquiescence. After the circuit court's order was filed, the Board noted an appeal and sought, from the circuit court, a stay of its order pending the appeal. The court denied the Board's motion, and, instead of pursuing a stay from the Court of Special Appeals or from this Court, the Board restored Dr. Levitsky's license in conformance with the circuit court's order. That action, Levitsky claims, makes the case moot and suffices as an acquiescence by the Board in the judgment.

■ Dealing first with the question of acquiescence, we know of no authority—and none has been cited to us by Dr. Levitsky—requiring a licensing agency whose decision has been vacated by a circuit court to seek a stay in the appellate courts in order to preserve its right of appeal. The doctrine of acquiescence—or waiver—is that "a *voluntary* act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." *Franzen v. Dubinok,* 290 Md. 65, 69, 427 A.2d 1002, 1004 (1981) (Emphasis added). The focus of the inquiry, we held in *Franzen,* "must be on whether the compliance with the

judgment is the result of legally sufficient compulsion." *Id.*
There was no voluntary act here on the part of the Board
inconsistent with its position that the circuit court erred in
vacating its order. The Board filed a timely appeal to the
Court of Special Appeals, sought a stay from the circuit court,
and even petitioned for *certiorari* in this Court. When the
stay was denied, the Board had no choice but to act in
conformance with the circuit court's order; any further with-
holding of Dr. Levitsky's license would have been patently
unlawful and may have subjected the Board and its members
to serious legal consequences.

■  Nor is the case moot. A question is moot "if, at the
time it is before the court, there is no longer an existing
controversy between the parties, so that there is no longer any
effective remedy which the court can provide." *Attorney Gen.*
*v. A.A. Co. School Bus,* 286 Md. 324, 327, 407 A.2d 749, 752
(1979); also *Insurance Commissioner v. Equitable,* 339 Md.
596, 613, 664 A.2d 862, 871 (1995). The controversy between
the Board and Dr. Levitsky is very much alive, and, as the
mandate attached to this Opinion demonstrates, there is an
effective remedy that this Court can provide.

■  The second prong of the motion to dismiss is the
contention that, because the circuit court remanded the case to
the Board for further proceedings without addressing all of
the issues raised by Dr. Levitsky, the court's order is not final
and therefore not appealable. We have consistently rejected
that approach. As we held in *Schultz v. Pritts,* 291 Md. 1, 6,
432 A.2d 1319, 1322–23 (1981), "[w]hen a court remands a
proceeding to an administrative agency, the matter reverts to
the processes of the agency, and there is nothing further for
the court to do. Such an order is an appealable final order
because it terminates the judicial proceeding and denies the
parties means of further prosecuting or defending their rights
in the judicial proceeding." *See also Eastern Stainless Steel*
*v. Nicholson,* 306 Md. 492, 501–02, 510 A.2d 248, 252 (1986);

*Md. State Retirement v. Hughes,* 340 Md. 1, 7, 664 A.2d 1250, 1253 (1995).

For these reasons, the motion to dismiss is denied.

### The Young Decision And The Merits Of This Case

As we have observed, the circuit court in this case followed and applied the principles enunciated in *Young v. Board of Physician, supra,* 111 Md.App. 721, 684 A.2d 17. The *Young* decision was a reported opinion of the Court of Special Appeals, and, by the time this case was decided in the circuit court, we had dismissed *certiorari* in *Young.*[2]  Although there are a number of factual differences between this case and *Young,* we find ourselves in disagreement with the approach taken by the Court of Special Appeals in *Young,* and it is largely for that reason that we conclude the circuit court's order was entered erroneously.

In *Young,* as here, the Board undertook review of a doctor's practice. The matter was referred to Med Chi, which delegated it to a medical review committee. It is not clear from the opinion whether the committee designated a medical review team to review the patient records in detail. The court noted only:

"The Committee spent four hours at a dinner meeting discussing the selected surgeries and reviewing the patients' files and other materials amassed for evaluation.

Rather than individually reviewing each of them, one of the files was assigned to each of the members, with each member presenting a review of the patient's file assigned to that member. During the presentation, pertinent material was circulated among the other members of the Committee. After each presentation, the full Committee discussed that

---

**2.**  We did not explain in our order dismissing *certiorari* as improvidently granted the reasons behind that action. We note now only that the order followed a motion by the Board to vacate the Court of Special Appeals decision on the ground that Dr. Young's appeal to that court was not timely. If the Board were correct, we would not have been able to reach the substantive issue, and we did not regard the fact-based question of timeliness as worthy of *certiorari* review.

patient's file until coming to a consensus as to whether Young had breached the standard of medical and surgical care with respect to that patient."

*Id.* at 724, 684 A.2d at 18.

Young argued, successfully, that that procedure was not in compliance with a Handbook requirement that each member of the committee review, individually, all of the files at issue and that they each complete the Initial Medical Record Assessment Worksheet. The court rejected the Board's position that the violations were inconsequential because the Handbook was merely an "internal document," and that, because no sanctions were prescribed for the violation of the Handbook requirements, those requirements were merely directory. It concluded that the procedure set forth in the Handbook was cast in mandatory language and afforded accused doctors important rights, and that it was therefore not merely directory. Moreover, because the Handbook was promulgated in response to a Board regulation, it was not just an internal document.[3]

The circuit court in this case, after accepting the conclusion that the procedures set forth in the Handbook were mandatory, found that "[o]nly one of the nine members of the peer review panel, Dr. Daly, completed the Initial Record Assessment Worksheet" and that "[s]even of the nine members did only a cursory review, if any, of the patient files and instead relied on Drs. Daly and Kelly's summary presentation of their own views of those files." Preliminarily, we note that those findings, which undergirded the court's ultimate conclusion, are not supported by the record. It is not clear that Drs.

---

3. In support of that conclusion, the court quoted language, ascribed to COMAR 10.32.02.03B(1), requiring Med Chi to conduct its peer review "according to procedures set forth by [Med Chi] and approved by the Board...." We are unable to find that language in the regulation cited, or any other COMAR regulation dealing with physician peer review. COMAR 10.32.02.03B(1) states only that Med Chi "shall conduct a peer review when a question of standards of care in the practice of medicine is referred by the Board." According to the Administrative History, that regulation was adopted effective November, 1994.

Daly and Kelly were actually members of the medical review committee, which appeared to consist of six other physicians. The record establishes only that they constituted the review team selected by the committee to go through each of the patient records and make a report to the committee. That procedure is authorized by Chapter XI, ¶ C. of the Handbook.

The committee is obliged to review the records examined by the team, along with any other records it chooses to review, and to be prepared to ask pertinent questions of the physician under scrutiny, but we see nothing in the Handbook requiring each member of the medical review committee to review each and every record of each and every patient when it has selected a medical review team for that purpose. Paragraph C. 7 requires each member of the *team* to review all ten records and to complete the Initial Medical Record Assessment Worksheet on each record reviewed, but that precise language does not appear in ¶ C.13, dealing with committee review. Paragraph C.13 states only that, in reviewing the records, the members of the committee shall use the Initial Medical Record Assessment Worksheet and may use the Detailed Medical Record Assessment Worksheet "to make notes about the record which can be used in discussing the case with the physician under review and in preparing the report for the [Board]." There is nothing to require that the worksheets be preserved or that they be used for any other purpose. Additionally, there is no Board finding in this case that the review by the committee members was "cursory," as found by the court, and the record does not require such a finding as a matter of law. Indeed, Dr. Daly's testimony before the ALJ was to the contrary. As noted, he testified, without contradiction, that the committee members "most certainly reviewed the reports," and, although he could not attest that they each reviewed "all of the medical records," he said that "they were knowledgeable enough that they could discuss each of the patients because we discussed each patient, one at a time."

Notwithstanding these particular errors, it does seem clear that some of the detailed procedures set forth in the Hand-

book were not followed. It is evident, for example, that Dr. Daly did not complete an Initial Medical Record Assessment Worksheet for any of the eleven patients whose records he reviewed, and his report to the medical review committee did not discuss in any detail the state of each patient's record. Dr. Kelly's report seems to be in compliance, but Dr. Daly's report, to the extent noted, was deficient. It is not clear, one way or the other, what records were individually examined by the members of the medical review committee or whether the records that were examined, were examined prior to the meeting of the committee. Nor does the record indicate that any of the members of the medical review committee used the approved worksheet. If they did, the worksheets are not preserved in the record.

The question raised is whether these kinds of deficiencies suffice to preclude the Board from revoking Dr. Levitsky's license. Levitsky maintains that they are because (1) they are jurisdictional in nature, and (2) they deprived him of due process of law. The Board urges that the procedural lapses were not jurisdictional in nature, did not deprive Dr. Levitsky of due process, should not have been considered by the circuit court because they were never raised before the ALJ or the Board, and, in any event, are substantively irrelevant because of § 14–405(g) of the Health Occupations Article. Some of these arguments overlap and fold into one another.

The key to the issue before us is § 14–405(g), which states, succinctly, that "[t]he hearing of charges may not be stayed or challenged by any procedural defects alleged to have occurred prior to the filing of charges." That statute seems to be unique, as a legislative enactment, to the disciplinary procedure governing physicians. It was added by amendment in the 1988 rewriting of the Medical Practices Act and does not appear in either the Administrative Procedures Act or in the Maryland statutes regulating other professions. The only counterpart to § 14–405(g) that we could find was Maryland Rule 16–710 b., applicable to disciplinary proceedings before the Attorney Grievance Commission. Coincidentally or not, the rule is cast in language identical to the statute.

Rule 16–701 b. was first adopted in 1965 as Rule BV 4.b., as part of the first rules governing attorney discipline. It was included in the 25th Report of the Court's Standing Committee on Rules of Practice and Procedure, but there is nothing in the archives of that committee, or of this Court, explaining its derivation. Its only mention by this Court over the years, in various attorney discipline cases, suggests that it simply codifies a more general common law principle. Currently, with certain exceptions based on exigency, attorneys accused of professional wrongdoing are entitled to administrative hearings before an Inquiry Panel and a Review Board before charges are filed. Those tribunals, which are part of the Attorney Grievance Commission structure, listen to the evidence presented by Bar Counsel and by the attorney and determine whether formal charges should be filed. If charges are filed, they are filed with us and then routinely sent to a circuit court judge who, acting as a master for this Court, takes testimony and, in a report to this Court, makes findings of fact and conclusions of law. In that regard, the judge acts in somewhat the same capacity as the ALJ in a normal contested case administrative proceeding.

On a number of occasions, when an attorney has complained of procedural irregularities on the part of the Inquiry Panel or Review Board, we have held that such irregularities are ordinarily immaterial and may not be challenged. We have stated that principle in a number of ways. In *Attorney Griev. Comm'n v. Stewart,* 285 Md. 251, 259, 401 A.2d 1026, 1030, *cert. denied,* 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979), we held that "[i]f a lawyer is given notice and an opportunity to defend in a full and fair hearing before a three-judge panel [that panel then serving much the same function as the single judge does currently], the question whether he was accorded due process of law by the Inquiry Panel and the Review Board is ordinarily immaterial." In *Attorney Griev. Comm'n v. Harris,* 310 Md. 197, 202, 528 A.2d 895, 897 (1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct. 1020, 98 L.Ed.2d 985 (1988), we characterized proceedings before the Inquiry Panel and Review Board as "investigatory in nature—designed to aid in

determining whether disciplinary action is warranted" and held that "any irregularity in the proceedings before the Inquiry Panel and the Review Board ordinarily will not amount to a denial of due process, as long as the lawyer is given notice and an opportunity to defend in a full and fair hearing following the institution of disciplinary proceedings in this Court." In both of those cases, we cited the rule in a footnote. *See also Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 538, 325 A.2d 718, 723–24 (1974); *Bar Ass'n of Balto. City v. Posner,* 275 Md. 250, 255, 339 A.2d 657, 659–60, *cert. denied,* 423 U.S. 1016, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); *Attorney Griev. Comm'n v. McBurney,* 282 Md. 116, 123, 383 A.2d 58 (1978).

The role of the peer review process is much akin to that of the Attorney Grievance Commission process. Allegations of professional wrongdoing are referred to members of the profession—physicians in the one case, lawyers in the other—to consider the allegations and determine whether they suffice to warrant the filing of charges. The peer review panel does not determine whether the accused physician or attorney is "guilty" of anything, only whether there is a sufficient basis for the filing of charges. Trial of any charges that may be filed is before a different tribunal, subject to different, and more significant, procedural protections. To the extent that deficiencies or irregularities in the pre-charge proceedings actually compromise the accused's opportunity for a full and fair hearing on the charges, in conformance with applicable Constitutional, statutory, or other legal requirements, or suffice in some way to deprive the agency (or court) of true jurisdiction to proceed, the accused is necessarily entitled, and must be allowed, to raise those deficiencies or irregularities, notwithstanding the statute or rule. Beyond that, however, the statute means what it says and must be given effect.

This obviously leaves Dr. Levitsky in a bind. Unless the peer review irregularities of which he now complains compromised his opportunity for a full and fair hearing before the ALJ and, on exceptions, before the Board, they may not,

as a substantive matter, serve as the basis for overturning the Board's ultimate decision. If, on the other hand, those irregularities *did* compromise his opportunity for a full and fair hearing, he has, unfortunately, waived his right to complain about them, as he failed to bring them to the attention of the ALJ or the Board.

Dr. Levitsky and his lawyer were present for at least part of the meeting of the medical review committee and were therefore in a position to inquire whether the committee members had individually reviewed the various patient records and otherwise complied with the Handbook procedures. Because they were presumably aware that Drs. Daly and Kelly had made reports to the committee, they could at least have made inquiry, if not actually determined, whether those reports were in compliance with the procedural requirements. They either had, or could have obtained, a copy of the final Med Chi report to the Board. Through cross-examination of Dr. Daly at the hearing before the ALJ or by calling Dr. Kelly or the members of the medical review committee, they could have ascertained precisely the procedure followed and objected to any noncompliance. Had they done so, a record could have been made and any deficiencies truly prejudicing Dr. Levitsky exposed and documented. None of that was done, however, and, indeed, when the final Med Chi report to the Board was offered into evidence, no objection was made. In light of those failures, the Board urges that Dr. Levitsky failed to preserve any due process-laden complaint he now makes.

In *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 518–19, 390 A.2d 1119, 1127 (1978), we quoted with approval the view of the Supreme Court in *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946) that "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reason for its action." We have held, consistently, that

questions, including Constitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in an action for judicial review. *See Cicala v. Disability Review Bd.*, 288 Md. 254, 418 A.2d 205 (1980); *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 501 A.2d 48 (1985); *Heft v. Md. Racing Comm'n*, 323 Md. 257, 592 A.2d 1110 (1991); *Holiday v. Anne Arundel*, 349 Md. 190, 707 A.2d 829 (1998). In *Heft*, we stated:

> "[W]hen one is entitled to raise a matter before an agency by making a timely objection or request, and thereby obtain a hearing at which the agency will consider the merits of the matter, but the person fails to take the required timely action and the agency therefore denies him a hearing and refuses to consider the merits of the matter, such person is not entitled to have a court consider the issue. In this situation, the procedural default before the agency ordinarily precludes judicial review of the merits."

*Id.* at 274, 592 A.2d at 1118 (emphasis added).

In this instance, we shall not rest our decision on the failure of Dr. Levitsky to raise his *Young* argument before the board but shall, instead, rule on the basis of § 14–405(g). We do not regard the irregularities complained of by Dr. Levitsky as raising a due process, or a jurisdictional, issue. The alleged failure of Dr. Daly and the members of the Medical Review Committee to use the Initial Medical Record Assessment Worksheet in no way compromised Dr. Levitsky's opportunity for a full and fair hearing before the ALJ or, on exceptions, the Board, and in no way divested the Board of jurisdiction to proceed. Every statutory prerequisite to the Board's proceeding was satisfied. The Board made a preliminary investigation, it referred the allegations to Med Chi for peer review, peer review was conducted, the Board received a report from Med Chi recommending that charges be filed, charges were, in fact, filed, and a contested case hearing was conducted by an ALJ. In the face of § 14–405(g), the court erred in vacating

the Board's order on the basis of *Young*.[4]

Because the court acted solely on the basis of *Young* and did not consider the other issues raised by Dr. Levitsky, some of which concerned the fairness of the hearing before the ALJ, we shall vacate the court's judgment and remand for further proceedings on Dr. Levitsky's petition for judicial review.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS; COSTS IN THIS COURT TO BE PAID BY APPELLEE.

---

4. This is, as noted, the second instance that has come to our attention, within the past year, of Med Chi's failure to follow the peer review procedures in the Handbook that both it and the Board adopted. The investigation of allegations against a physician that could lead to revocation or suspension of a license is a serious matter. If the procedures set forth in the Handbook are no longer appropriate, they should be changed. If, on the other hand, Med Chi is simply unwilling to follow the mandated procedures and live up to its responsibilities, the General Assembly may wish to reconsider Med Chi's role in the disciplinary process.