REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1095

September Term, 2014

_____

MARK R. GEIER

v.

MARYLAND STATE BOARD OF
PHYSICIANS

_____

Woodward,
Graeff,
Moylan, Jr., Charles E.
    (Retired, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  May 29, 2015

Mark R. Geier ("Dr. Geier"), appellant, seeks review of the decision of the Maryland State Board of Physicians (the "Board"), appellee, to revoke his license to practice medicine.[1] The Board revoked his license after it determined that he violated numerous provisions of the Medical Practice Act (the "Act"), Md. Code (2009 Repl. Vol.) §§ 14-401 *et seq.*, of the Health Occupations Article ("HO"), including HO §§ 14-404(a)(3)(ii) (unprofessional conduct in the practice of medicine), 14-404(a)(11) (willfully making or filing a false report or record in the practice of medicine), 14-404(a)(22) (failing to meet standards, as determined by peer review, for the delivery of quality medical care), 14-404(a)(40) (failing to keep adequate medical records), and 14-404(a)(12) (willfully failing to file or record any medical report as required under law, willfully impeding or obstructing the filing or recording of the report, or inducing another to fail to file or record the report).

Dr. Geier petitioned for judicial review in three jurisdictions, the Circuit Court for Baltimore City, the Circuit Court for Baltimore County, and the Circuit Court for Montgomery County. After Dr. Geier voluntarily dismissed his petitions in Baltimore City and Baltimore County, the Board moved to dismiss the remaining petition on *res judicata* grounds, pursuant to Md. Rule 2-506(c), which provides "that a notice of dismissal operates as an adjudication upon the merits when filed by a party who has previously dismissed in

---

[1] Prior to the revocation of his license, Dr. Geier treated children with autism. The administrative law judge ("ALJ") stated that autism "is a generalized term for a variety of neuro-developmental disorders that range in severity across a spectrum. This variety of disorders, referred to in their entirety as Autism Spectrum Disorder ("ASD"), have symptoms that substantially impact a child's functioning in multiple spheres, including language and social interaction." She explained that typical symptoms include stereotypic movements, self-stimulatory movements, and unusual preoccupations with certain objects.

any court of any state or in any court of the United States an action based on or including the same claim."[2] The Circuit Court for Montgomery County denied the Board's motion to dismiss, and it affirmed the Board's decision on the merits.

On appeal, Dr. Geier presents 12 questions for this Court's review, which we have consolidated and rephrased, as follows:

1. Was there substantial evidence in the record to support the Board's findings that Dr. Geier: (1) engaged in unprofessional conduct in the practice of medicine, pursuant to HO § 14-404(a)(3)(ii); (2) willfully made a false record in the practice of medicine, pursuant to HO § 14-404(a)(11); and (3) failed to meet appropriate standards for the delivery of quality medical care, pursuant to HO § 14-404(a)(22)?

2. Did the ALJ abuse its discretion in admitting the testimony of the State's expert witness, Dr. Linda Grossman?

3. Did the ALJ properly exclude from evidence two exhibits offered by Dr. Geier?

4. Did the Board properly reject Dr. Geier's contention that the State was required to admit into evidence two peer review reports?

5. Did the circuit court properly deny Dr. Geier's request to supplement the administrative record?

6. Did the circuit court abuse its discretion in denying Dr. Geier's motion for a stay?

The Board, although it did not file a cross-appeal, lists in its brief the following additional question for review:

Was Dr. Geier's petition for judicial review in the Circuit Court for Montgomery County barred on *res judicata* grounds under [Md.] Rule 2-506(c) after Dr. Geier voluntarily dismissed two other petitions for judicial review that he had filed to contest the Board's decision?

---

[2] Md. Rule 2-506 was amended, effective January 1, 2014, moving (c) to (d).

2

For the reasons that follow, we conclude that the Board's question presented is not properly before this Court. With respect to the issues raised by Dr. Geier, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Relevant Proceedings

On October 3, 2006, the Board notified Dr. Geier that it had received a complaint against him regarding his use of the drug Lupron to treat autistic children.[3] The complainant, who was neither a patient of Dr. Geier's, nor a parent of a patient, alleged that, in treating autistic children, Dr. Geier was: (1) practicing outside of the scope of his expertise and the prevailing standard of care for autism; (2) experimenting on children without a rational scientific theory or the supervision of a qualified review board; and (3) failing to provide appropriate informed consent regarding the potential side effects of Lupron and similar drugs.

On April 27, 2011, the Board issued an order for summary suspension of Dr. Geier's license to practice medicine, concluding that the "public health, safety or welfare imperatively required emergency action." On May 16, 2011, the Board issued charges

---

[3] The record reflects that Lupron is an FDA-approved drug used for the treatment of precocious puberty, a condition where girls under the age of eight have changes in breast development or pubic hair and boys under the age of nine have penile and scrotal changes and pubic hair. Lupron can reduce the symptoms of puberty in children with higher than normal levels of testosterone. The reduction of testosterone can decrease aggressive, hyperactive and hypersexual behaviors.

3

against Dr. Geier pursuant to the Act. Dr. Geier requested hearings on both the order for summary suspension and the charges.

On June 17, 20, 21, 23, 27, and 30, 2011, an Administrative Law Judge ("ALJ") held a hearing on the Board's order for summary suspension. On September 26, 2011, the ALJ issued a proposed decision upholding summary suspension of Dr. Geier's license.

In the interim, on September 15, 2011, the Board issued amended charges under the Act against Dr. Geier. The amended charges alleged violations of HO §§ 14-404(a)(3)(ii) (unprofessional conduct in the practice of medicine); (a)(11) (willfully making or filing a false report or record in the practice of medicine); (a)(12) (willfully failing to file or record any medical record as required under law); (a)(18) (practicing medicine with an unauthorized person or aiding an unauthorized person in the practice of medicine); (a)(19) (gross overutilization of health care services); (a)(22) (failure to meet appropriate standards for the delivery of quality medical care); and (a)(40) (failure to keep adequate medical records).

On December 6, 7, 8, 9, and 15, 2011, the ALJ held a hearing on the amended charges. At the hearing, by agreement of the parties, the entire record of the prior summary suspension hearing, including all testimony presented and all exhibits admitted, were incorporated into evidence. On March 13, 2012, following the hearing, the ALJ issued a 126-page proposed decision, recommending that the amended charges be upheld with regard to HO §§ 14-404(a)(3)(ii), 14-404(a)(11), 14-404(a)(22), and 14-404(a)(40) and dismissed with regard to HO §§ 14-404(a)(12), 14-404(a)(18), and 14-404(a)(19). The ALJ recommended that Dr. Geier's license be revoked.

4

In April 2012, Dr. Geier filed exceptions to the ALJ's proposed decision. On May 23, 2012, the Board held an exceptions hearing. On August 22, 2012, the Board issued a Final Decision and Order, ordering that Dr. Geier's license be revoked.

The Board found, among other things, that Dr. Geier treated patients with Lupron, a medication that was not approved by the U.S. Food and Drug Administration ("FDA") for use on children in the absence of precocious puberty, and that Dr. Geier did not perform an adequate examination to determine if the patients had precocious puberty. Although it noted Dr. Geier's opinion that Lupron therapy was appropriate for purposes not approved by the FDA or the American Academy of Pediatrics, and his testimony that he treated patients who met his profile with Lupron, it found that, with the exception of one patient who was the subject of the hearing, "none of these patients met even Dr. Geier's profile for Lupron therapy."

The Board also found that Dr. Geier

> prescribed chelation therapy to patients who failed to display the need for chelation. He began this therapy without documenting a reason for the treatment and without adequate documented informed consent. He violated the standard of quality care by so doing. He also violated the standard of quality care by prescribing for patients . . . a drug not approved for any use in the United States.

(Footnotes omitted). The Board found that Dr. Geier "egregiously violated basic medical standards in his treatment of these patients by not evaluating them properly, lying about which drug he was prescribing, and failing to evaluate in any realistic medical way whether his intensive and very expensive treatment was effective."

5

The Board concluded that Dr. Geier violated multiple provisions of the Act, stating as follows:

> Dr. Geier committed unprofessional conduct in the practice of medicine within the meaning of [HO] § 14-404(a)(3)(ii) when he had parents sign a consent form that falsely implied that he was conducting an experimental protocol approved by an Institutional Review Board [("IRB")] when in fact that review board was, as the ALJ put it, "a façade covering the intentions of a group that did not believe that they were bound by federal or state law and had no intention of being so bound."[4]  He committed further unprofessional conduct when he had a parent sign a consent form for the use of one drug for chelation therapy when in fact another drug, a drug not approved for use in the United States, was intended to be used and was in fact used.  His violations of the standard of care, especially his treating of some patients without examining them and his reaching diagnoses in the absence of required diagnostic tests, were so egregious as to amount to unprofessional conduct in themselves.
>
> By willfully reporting false credentials when he applied for the renewal of his medical license, Dr. Geier made a willfully false statement in the practice of medicine within the meaning of [HO]  § 14-404(a)(11).
>
> By failing to properly evaluate patients before treating them with an intensive regimen of drug therapy, by providing the parents with inadequate or falsified consent forms, by failing to properly evaluate whether his treatment was working, by ordering continued therapy to a patient for whom there was no possibility of monitoring the effects, and by failing to keep adequate records, Dr. Geier failed to meet the standard of quality care required by [HO] § 14-404(a)(22).

---

[4] An Institutional Review Board (IRB) is an oversight entity for research.  *Grimes v. Kennedy Krieger Institute, Inc.*, 366 Md. 29, 38-39 (2001).

> Their primary functions are to assess the protocols of the project to determine whether the project itself is appropriate, whether the consent procedures are adequate, whether the methods to be employed meet proper standards, whether reporting requirements are sufficient, and . . . review [] the potential safety and the health hazard impact of a research project on the human subjects of the experiment, especially on vulnerable subjects such as children.

*Id.* at 39.

By failing to document adequately the reasons these treatments were initiated, halted or modified, by failing to maintain clear evidence of informed consent, or even in some cases failing to document even the manner in which the patients were contacted, Dr. Geier failed to keep adequate medical records within the meaning of [HO] § 14-404(a)(12). This charge was based on the fact that the Board's analyst, having subpoenaed Dr. Geier's medical records for a certain patient and having received records that appeared on their face to be incomplete, wrote to Dr. Geier, emphasizing that all medical records for this patient should be produced. The Board's letter also required Dr. Geier to respond in writing if no additional records were submitted. Dr. Geier did not produce any records; neither did he respond in writing as required. According to the testimony provided at the hearing, there were no additional records regarding this patient.

Finally, the Board concluded that Dr. Geier violated HO § 14-404(a)(12). Although the ALJ had concluded that there was no violation of the statute because no records existed that Dr. Geier failed to file with the Board, the Board disagreed. It explained:

The statute elsewhere requires a physician to "cooperate" with the Board's investigation. [HO] § 14-404(a)(33). The most obvious way in which most investigated physicians are asked to cooperate is by filing reports in response to questions posed by an analyst in the course of an investigation. In light of the facts that (1) the statute requires cooperation by the investigated physician; (2) the medical records appeared on their face to be incomplete; and (3) that the analyst required in writing that Dr. Geier respond in writing if there were no additional medical records, Dr. Geier's failure to file a report to the Board to that effect when required by the analyst was a violation of [HO] § 14-404(a)(12).

The Board concluded, however, that this was a "peripheral offense" that was "unrelated to Dr. Geier's actual care of his patients," and it "pale[d] in comparison to the egregious violations of the standard of care and the egregious unprofessional conduct displayed by Dr. Geier in this case." Accordingly, the Board determined that it would not impose a sanction based upon the violation of HO § 14-404(a)(12).

The Board did impose a sanction, however, for the other violations of the Act. In discussing the appropriate sanction, the Board stated:

Dr. Geier has displayed in this case an almost total disregard of basic medical and ethical standards by treating patients without properly examining or diagnosing them, continuing treatment without properly evaluating its effectiveness, and providing "informed consent" forms that were misleading and in at least one case blatantly false. He provided treatments supposedly according to an investigational protocol, but the investigation was approved only by a sham [IRB], and he applied protocols to patients who did not fit his own profile. He provided treatment by a drug not approved for use in this country while informing parents that a different drug would be used. His actions toward his patients were not those of an honest and competent physician, nor do they appear to be those of an objective and ethical researcher. Dr. Geier made little use of those methodologies that distinguish the practice of medicine as a profession. At the same time, he profited greatly from the minimal efforts he made for these patients. In plain words, Dr. Geier exploited these patients under the guise of providing competent medical treatment. Such a use of a medical license is anathema to the Board. The Board has no hesitation in revoking his medical license.

On September 17, 2012, Dr. Geier petitioned for judicial review. On April 9, 2014, after oral argument, the circuit court affirmed the Board's final decision.

The court initially noted that Dr. Geier did "not address nor refute many of the Board's findings of fact and conclusions of law regarding the violations of the" Act. Those unchallenged determinations included:

[T]he Board's findings that he provided false informed consent to the parent of his patient for use of a drug that was not approved by the FDA for use in the United States, that he failed to properly evaluate his patients prior to treatment and failed to adequately monitor his patients following treatment, and that he failed to adequately document the treatment of his patients.

With respect to the findings that Dr. Geier did challenge, the court concluded that there was substantial evidence to support the Board's decisions that: (1) "Petitioner

8

willfully falsified his license renewal applications"; (2) "Petitioner was performing human research on [one patient] and that an IRB should have been established"; (3) the IRB did not have any members unaffiliated with Dr. Geier and his Institute of Chronic Illness ("ICI"); (4) Dr. Geier violated HO § 14-404(a)(22) and (40); and (5) the Board's expert "was a qualified expert and the Board presented a competent peer reviewer to testify." It further concluded that "the sanction of revoking Petitioner's medical license recommended by the ALJ and imposed by the Board is not arbitrary and capricious."

On April 21, 2014, Dr. Geier moved to alter or amend the court's ruling. On July 9, 2014, the court issued an Amended Memorandum Opinion and Order, reaffirming the Board's decision.

## II.

### Dr. Geier's Credentials and Practice

Dr. Geier attended medical school at George Washington University. In 1979, after completing medical school, Dr. Geier obtained his medical license from the State of Maryland. Through his medical practice, The Genetic Centers of America, Dr. Geier treated pediatric patients with Autism Spectrum Disorders ("ASD"). Dr. Geier does not have any credentials in pediatrics or autism. Instead, his residency was a one-year program in obstetrics and gynecology, which he completed in 1979.

Medical doctors in Maryland need to renew their license to practice medicine every two years. The License Renewal Form asks the doctor to list "up to two (2) specialty areas *only* if certified by a recognized board of the American Board of Medical Specialties (ABMS)." On his 2006, 2008, and 2010 license renewal applications filed with the Board,

Dr. Geier stated that he was certified by ABMS-recognized specialty boards as follows: in "Genetics/Medical" in 2006; in "Genetics Clinical [General]" in 2008; and in "Genetics, Medical [Ph.D.]" and "Epidemiology" in 2010. Dr. Geier was not Board-certified in any of these specialties.[5] Dr. Geier testified that he selected those categories from the list of ABMS-recognized board certifications because there was no option to state that he was certified by the American Board of Medical Geneticists ("ABMG") as a "genetic counselor." The ABMS's list of recognized physician specialties does not list "genetic counselor" as a medical specialty.

Since 2004, Dr. Geier has treated 1,500 to 2,000 children with ASD. At issue in this case was his treatment of seven patients, Patients A, B, E, F, G, H, and I.

The ALJ summarized Dr. Geier's practice as follows:

> All the Patients were presented to [Dr. Geier] already diagnosed by another physician with autism or a condition on the autism spectrum. All presented with severe symptoms of autism, and all but Patient G presented with adverse behaviors such as aggression and sexual activities, and accelerated signs of puberty at a young age. [Dr. Geier] diagnosed all the children with Precocious Puberty, administered Lupron therapy to all, and chelation therapy to most. . . .

> [Dr. Geier] contends that mercury is the ultimate cause of the Patients' aggressive symptoms. Under his theory, the Patients are handicapped by the presence of a [single nucleotide polymorphism ("SNP")] of their [methylenetetrahydrofolate reductase ("MTHFR")] gene that causes them to be more sensitive and less able to excrete mercury than the general population. This build-up of mercury in their systems interferes with the production of glutathione; glutathione is necessary to prevent a build-up of testosterone and testosterone-related androgens and, conversely, the build-up of testosterone also inhibits the production of glutathione. The build-up

---

[5] The ALJ found, and the record supports, that the American College of Epidemiology elected Dr. Geier to be a "fellow" of the organization, but that organization is not a board recognized by the American Board of Medical Specialties (ABMS).

of testosterone makes the children more aggressive and increases hypersexual behaviors.

Dr. Geier employed two types of therapy: he would medicate his patients with Lupron, a hormone designed to suppress testosterone and estrogen. In many cases, in addition to administering Lupron, he would use chelation therapy, which is intended to remove high levels of heavy metals, such as lead and mercury, from the body.

Although Lupron is approved by the FDA for use on adults for conditions including prostate cancer, the only approved, or "on-label," use for Lupron in children is for the treatment of precocious puberty. Testimony indicated that, due to the significant potential risks in the use of Lupron, face-to-face monitoring is required at least every three months.

Dr. Geier used the drugs DMSA (dimercaptosuccinic acid) and DMPS (2,3-dimercapto-1-propane-sulfonic acid) in his chelation therapy. Although DMSA has been approved by the FDA for removing severe levels of heavy metals from the body, DMPS is not approved by the FDA for any purpose. The ALJ noted that "[p]hysicians who prescribe DMPS must inform their patients or their patients' representatives, of its experimental status in the United States, and have a full disclosure/informed consent document" in the patient's medical chart. Chelation therapy also has the potential for significant adverse complications, and therefore, chelation requires a physician to evaluate the patient face-to-face at least once every month. There is not a consensus in the medical community that chelation therapy should be used to treat ASD.

Dr. Geier diagnosed each patient with precocious, or premature, puberty. The criteria for diagnosing precocious puberty includes a complete history and physical

11

examination, which includes: assessing genital development; determining bone age, which is based upon an X-ray of the wrist; completing hormone studies; and "Tanner Staging," a medical grading of where a child falls in the steps of puberty. In addition, a diagnosis of precocious puberty generally is reserved for girls under the age of eight and boys under the age of nine.

Despite representing to insurance companies that Lupron was being used to treat precocious puberty, Dr. Geier testified that he would offer the patient's parent a two to three month trial of Lupron if laboratory tests showed certain results.[6] Specifically, he prescribed Lupron if the test results showed that the patient had one or more single genetic changes on a particular gene, low glutathione (a "cofactor" for an enzyme that assists the body to excrete mercury), high testosterone, low levels of the hormone DHEA-S, high levels of the hormone DHEA, and adverse behavioral signs of puberty, such as aggression and hypersexual behavior.

### III.

### Dr. Geier's Patients

*a. Patient A*

Patient A, a male, was diagnosed with autism when he was four years old. He was referred to Dr. Geier when he was nine years and eight months old. His initial lab testing

---

[6] Dr. Geier does not dispute that he diagnosed his patients with precocious puberty, or that he did not conduct physical examinations of his patients. Nor does he dispute the Board's findings regarding the treatments that he prescribed. Rather, he argues that he was not required to diagnose his patients with precocious puberty or conduct a physical examination before administering Lupron "off-label" to treat autism.

indicated that he had high testosterone levels and high DHEA, but normal DHEA-S. Dr. Geier diagnosed him with precocious puberty and prescribed Lupron based on his diagnosis. Dr. Geier also prescribed DMPS for chelation therapy, although his laboratory results did not indicate that there was heavy metal poisoning. There was also no written informed consent form and no documentation that the risks of the treatment were discussed.

b. *Patient B*

Patient B, a male with autism, was six years old when he was initially assessed by Dr. Geier. Dr. Geier did not perform a physical examination of Patient B at the initial assessment, or at any time during Patient B's treatment. Dr. Geier's precocious puberty diagnosis did not include any information about bone age or Tanner Stage assessments. Dr. Geier prescribed both Lupron and DMPS for the patient. The patient's parents were sent a "Geier Clinical Study Protocol," which described the Lupron treatment but did not explain the risks and benefits.

c. *Patient E*

Patient E, a female with ASD, was diagnosed by Dr. Geier with precocious puberty when she was nine years and eight months old. Dr. Geier did conduct a physical examination, but the expert for the Board opined that the examination was inadequate to support a diagnosis of precocious puberty. There was no written informed consent and no documentation that the risks and benefits of the treatment or possible adverse side effects of Lupron were discussed with her parents.

*d. Patient F*

Patient F, a female with autism, underwent laboratory testing under Dr. Geier's direction when she was seven years and eleven months old. The expert for the Board testified that the physical examination was inadequate, consisting only of measuring the patient's height and weight and noting some, but not all, of the required features. Dr. Geier did not perform a bone age determination. Patient F nevertheless was prescribed Lupron. No written informed consent was obtained, and there is no documentation that the risks or potential side effects or goals of treatment were discussed. After prescribing the drugs, Dr. Geier did not conduct any further physical examination, and he did not make any assessments to determine whether the patient had suffered side effects from the treatment.

*e. Patient G*

Patient G, a male with pervasive developmental disorder, was eight years old when Dr. Geier made his initial assessment. Dr. Geier did not conduct a physical examination; in fact, he never met the patient in person. Dr. Geier did not conduct a bone age evaluation or a Tanner Stage evaluation. He prescribed the patient Lupron, as well as DMPS for chelation therapy, although the Board's expert opined that there were no findings indicating elevated mercury levels. There was no written informed consent, and no documentation that any risk factors were discussed. Dr. Geier did not monitor the patient for possible adverse side effects.

*f. Patient H*

Patient H, a female with ASD, was over eight years old when Dr. Geier became involved with her treatment. Dr. Geier diagnosed her with precocious puberty without

performing a complete physical examination.  No bone age evaluation was performed, and the patient was outside the age range for a precocious puberty diagnosis.  Based upon his diagnosis, Dr. Geier treated Patient H with Lupron.  There was no evidence that the parents were notified of the risk and potential adverse effects of the treatment or that Dr. Geier monitored her.

### g. *Patient I*

Patient I, a male with autism, was nine and a half years old when Dr. Geier initially assessed him.  Dr. Geier prescribed the patient Lupron for precocious puberty and treated him with chelation therapy without meeting the patient or performing a physical examination.

Dr. Geier provided a parent of Patient I with a consent form, which the parent signed.  The consent form stated that Patient I would be prescribed DMSA, a medication approved for use by the FDA.  Dr. Geier, however, did not prescribe DMSA.  Instead, he prescribed DMPS, which is not approved for any use by the FDA.  The consent form also stated that the patient's treatment protocol was approved by the IRB for the ICI, an organization run by Dr. Geier.  The consent form did not convey that the IRB was affiliated with the ICI or with Dr. Geier.

## DISCUSSION

### I.

### *Res Judicata*

Before discussing Dr. Geier's arguments on the merits, we address the Board's argument that Dr. Geier's petition for judicial review should have been dismissed on *res*

*judicata* grounds. The Board acknowledges that a voluntary dismissal typically is done without prejudice. It argues, however, that pursuant to Md. Rule 2-506(c), a notice of voluntary dismissal "operates as an adjudication upon the merits when filed by a party who has previously dismissed in any court of any state or in any court of the United States an action based on or including the same claim."

Here, as indicated, after the Board's decision, Dr. Geier filed, on September 14, 2012, a petition for judicial review in the Circuit Court for Baltimore County, on September 17, 2012, a petition for judicial review in the Circuit Court for Montgomery County, and on September 18, 2012, a petition for judicial review in the Circuit Court for Baltimore City. In at least one of the petitions, he asserted: "[p]etitions for Judicial Review are also being filed in Montgomery and Baltimore Counties. Petitioner believes that venue is appropriate in one or both of these other counties, and he files the instant Petition for Judicial Review only as a precaution in the event that the [courts] in these other venues reach a contrary conclusion."

On December 28, 2012, Dr. Geier voluntarily dismissed his Baltimore City petition, without prejudice, stating that he was "electing to proceed with the judicial review in Montgomery County." On January 2, 2013, he voluntarily dismissed his Baltimore County petition, without prejudice, stating that he was "electing to proceed with the judicial review in Montgomery County."

On February 13, 2013, the Board moved for dismissal of the Montgomery County petition, the only remaining petition, on the ground of *res judicata*. The Board argued that, pursuant to Md. Rule 2-506(c), because Dr. Geier had voluntarily dismissed the same

petition for judicial review in two other courts, the second voluntary dismissal operated as an adjudication upon the merits.

Dr. Geier responded that, in filing his petitions, he "believed that venue for judicial review was proper in multiple counties," and "given the 30-day statute of limitations on such petitions, [he] could not afford to risk dismissal of his petition for filing in the incorrect venue." Thus, "out of an abundance of caution, [he] filed his petition in all three of the counties where he believe venue might be appropriate."

On March 25, 2013, the court denied the Board's motion to dismiss, stating as follows:

> This case is unlike the usual situation where Rule 2-506(c) arises. [Dr. Geier] . . . did not file and then dismiss two successive lawsuits. Here [Dr. Geier] simultaneously filed three petitions for judicial review in three different Maryland courts . . . claiming he was unsure of the proper venue and was concerned about the statute of limitations. Ultimately, [Dr. Geier] voluntarily dismissed the Baltimore City and Baltimore County petitions and chose to proceed only with the Montgomery County case. Whatever [Dr. Geier's] reason[s] were for originally filing three separate petitions, it cannot be said that applying the "two dismissal" rule to this situation would further the purpose of Rule 2-506(c). [The Board] has not asserted that it was prejudiced by the dismissals. The dismissals did not result in duplicative, wasteful or harassing litigation. While a literal interpretation of Rule 2-506(c) may weigh in favor of dismissal, the [c]ourt looks to substance over form and finds it would run contrary to the intent behind Rule 2-506(c) and the interests of justice to grant this Motion to Dismiss and "close the courthouse doors" to [Dr. Geier].
>
> Lastly, and perhaps more importantly is the fact that this case is not an initial lawsuit. Further, despite the fact that it is customary to call these cases administrative appeals, they are not. This kind of action[] is for judicial review of an administrative decision.

(Footnote omitted).

17

The Board argues on appeal, as it did before the circuit court, that under the plain language of Md. Rule 2-506(c), "the second dismissal should have operated as an adjudication on the merits." It asserts that the circuit court "explicitly recognized as much but concluded that the spirit of the rule counseled against dismissing Dr. Geier's action." To the contrary, the Board asserts, Dr. Geier's actions in "forc[ing] the Board to litigate this matter in three separate jurisdictions while he maneuvered to land in the court he believed gave him the best chance to win," manipulated both the courts and the Board. The Board argues that this Court should affirm the circuit court's judgment on "the additional ground" that the Montgomery County petition was barred under the doctrine of *res judicata* pursuant to Md. Rule 2-506(c).

Dr. Geier contends that this issue is not properly before this Court. Stating that the Board is seeking to attack, as opposed to affirm, the court's decision, Dr. Geier contends that, for this issue properly to be before this Court, the Board was required to file an appeal or a cross-appeal, which the Board did not do.

On the merits, Dr. Geier contends that the "two dismissal" rule, which provides that a second voluntary dismissal of a complaint operates as an adjudication on the merits, only precludes "a party from proceeding with a *subsequent* third action where the action has been dismissed twice *previously*." He asserts that, in this case, the present proceeding was not a "subsequent action" because it was "the second of three total actions filed," and the "action in Montgomery County was commenced before either of the other two actions were dismissed." Moreover, he argues, his motive in filing in three courts was "not to harass the Board but to avoid the dismissal of his appeal" for improper venue.

18

We need not address this issue on the merits. We agree with Dr. Geier that the issue is not properly before this Court because the Board did not file a cross-appeal raising this issue.

In *Paolino v. McCormick & Company*, 314 Md. 575, 579 (1989), the Court of Appeals explained the circumstances when a cross-appeal is impermissible and when it is required:

> [A]n appeal or cross appeal is impermissible from a judgment wholly in a party's favor. *Offutt v. Montgomery Cty. Bd. of Ed.*, 285 Md. 557, 564 n.4 (1979). In that situation, however, despite a party's inability to raise adverse issues by appeal or cross appeal, if the losing party appeals, the winning party may argue as a ground for affirmance matters resolved against it at trial. As Judge Eldridge explained, for the Court, in *Offutt*:
>
> > [W]here a party has an issue resolved adversely in the trial court, but . . . receives a wholly favorable judgment on another ground, that party may, as an appellee, argue as a ground for affirmance the matter that was resolved against it at trial. . . . This is merely an aspect of the principle that an appellate court may affirm a trial court's decision on any ground adequately shown by the record.
>
> *Id.* (citations omitted). But one who seeks to attack, modify, reverse, or amend a judgment (as opposed to seeking to affirm it on a ground different from that relied on by the trial court) is required to appeal or cross appeal from that judgment.

*Accord Uninsured Employers' Fund v. White*, 219 Md. App. 410, 422-23 (2014).

*Joseph H. Munson Co. v. Secretary of State*, 294 Md. 160 (1982), *aff'd*, 467 U.S. 947 (1984), is helpful in our analysis of this case. There, Munson sought a declaration that a statute was unconstitutional. *Id.* at 162-63. The Secretary of State argued that the statute was constitutional, but he also challenged Munson's standing to raise the constitutional

issue. *Id.* at 167-68. The circuit court declared that the statute was constitutional. *Id.* at 166.

After Munson appealed, the Secretary of State reasserted his challenge to Munson's standing. *Id.* at 167-68. Munson argued that the issue was not properly before the Court because the Secretary failed to file a cross-appeal. *Id*. The Court of Appeals agreed with Munson, stating as follows:

> Under circumstances where absence of standing would present an alternate ground for upholding a trial court's judgment, an appellee is entitled to argue that ground in an appellate court. In such situation, a cross-appeal would be unnecessary and, in fact, would be improper. Moreover, in that situation, even if lack of standing were not raised by the appellee, an appellate court noticing the issue would normally consider it sua sponte under the principle that a judgment will ordinarily be affirmed on any ground adequately shown by the record, whether or not relied on by the trial court or raised by a party.

> Thus, in the case at bar, if the trial court had dismissed the action on some ground other than lack of standing, the Secretary as appellee would be entitled to argue Munson's alleged lack of standing as an alternate basis for affirmance. However, the trial court did not dismiss the action. Instead, it rendered a declaratory judgment on the merits. Munson's alleged lack of standing would not furnish an alternate ground for affirming the declaratory judgment. On the contrary, the Secretary's argument amounts to an attack upon the judgment. If the issue is properly before us, and if we agreed that Munson had no standing, we would be obliged to order that the trial court's judgment be reversed and that the case be remanded with directions to dismiss the action.

> Consequently, the Secretary is attempting to challenge the trial court's judgment in this case without having taken an appeal. A party to a trial court proceeding, however, is not entitled to seek direct appellate review and reversal of the trial court's judgment unless he has filed a valid, timely order of appeal. The Secretary, not having filed an order of appeal, may not on appeal attack the trial court's declaratory judgment.

*Id.* (citations omitted).

20

A similar analysis applies here. The circuit court affirmed the decision of the Board on the merits, but it denied the Board's request to dismiss the case on the ground of *res judicata*. The Board's argument on appeal is that the circuit court should have dismissed the petition, and it erred in failing to do so and instead addressing the merits of Dr. Geier's claims. If we agreed, we would not be affirming the circuit court on another ground, but rather, we would be reversing the circuit court and remanding with directions to dismiss the petition for judicial review. Accordingly, the Board was required to file a cross-appeal. Because it did not do so, this issue is not properly before this Court, and we decline to address it.

## II.

### Substantial Evidence[7]

### A.

### Standard of Review

Judicial review of an administrative decision "generally is a 'narrow and highly deferential inquiry.'" *Seminary Galleria, LLC v. Dulaney Valley Improvement Ass'n, Inc.*, 192 Md. App. 719, 733 (2010) (quoting *Maryland-Nat'l Park & Planning Comm'n v.*

---

[7] The arguments set forth in Dr. Geier's brief in this Court do not track his questions presented, and it is difficult to discern which of his arguments specifically dispute whether there was substantial evidence in the record as a whole to support the Board's findings. We shall address the issue of substantial evidence only with regard to the findings made by the Board that Dr. Geier does appear to contest, i.e., HO §§ 14-404(a)(22), (a)(3)(ii), and (a)(11). He does not challenge, and we will not address, the Board's findings concerning his failure to keep adequate medical records, pursuant to HO § 14-404 (a)(40), or its findings that he failed to cooperate with its investigation, pursuant to HO § 14-404(a)(12).

*Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 83 (2009)). This Court looks "through the circuit court's decision and evaluates the decision of the agency," *Chesapeake Bay Foundation, Inc. v. Clickner*, 192 Md. App. 172, 181 (2010), determining "'if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Cosby v. Dep't of Human Res.*, 425 Md. 629, 638 (2012) (quoting *Bd. of Phys. Quality Assurance v. Banks*, 354 Md. 59, 67-68 (1999)).

With respect to the Board's factual findings, we apply the substantial evidence test, which "'requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the agency, we find a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Miller v. City of Annapolis Historic Pres. Comm'n*, 200 Md. App. 612, 632 (2011) (quoting *Montgomery Cnty v. Longo*, 187 Md. App. 25, 49 (2009)). Administrative credibility findings likewise are entitled to great deference on judicial review. Credibility findings of hearing officers who themselves have personally observed the witnesses "'have almost conclusive force.'" *Kim v. Maryland State Bd. of Physicians*, 196 Md. App. 362, 370 (2010), *aff'd*, 423 Md. 523 (2011) (quoting *Anderson v. Dep't of Pub. Safety and Corr. Srvs.*, 330 Md. 187, 217 (1993)). A reviewing court "'may not substitute its judgment for the administrative agency's in matters where purely discretionary decisions are involved.'" *Mueller v. People's Counsel for Baltimore Cnty.*, 177 Md. App. 43, 82-83 (2007) (quoting *People's Counsel for Baltimore Cnty v. Surina*, 400 Md. 662, 681 (2007)), *cert. denied*, 403 Md. 307 (2008). With respect to the Board's conclusions of law, "a certain amount of deference may be afforded when the

22

agency is interpreting or applying the statute the agency itself administers." *Employees'*

*Ret. Sys. of Balt. v. Dorsey*, 430 Md. 100, 111 (2013). "We are under no constraint,

however, 'to affirm an agency decision premised solely upon an erroneous conclusion of

law.'" *Id.* (quoting *Thomas v. State Ret. & Pension Sys.*, 420 Md. 45, 54-55 (2011)).

**B.**

**Violation of HO § 14-404(a)(22)**

The Board found that Dr. Geier violated HO § 14-404(a)(22), which requires a

physician to meet the standards for quality medical care. The Board concluded as follows:

> By failing to properly evaluate patients before treating them with an intensive regimen of drug therapy, by providing the parents with inadequate or falsified consent forms, by failing to properly evaluate whether his treatment was working, by ordering continued therapy to a patient for whom there was no possibility of monitoring the effects, and by failing to keep adequate records Dr. Geier failed to meet the standard of quality care required by [HO] § 14-404(a)(22).

In support of these conclusions, the Board made the following findings of fact:

> **(1)** Dr. Geier failed to meet basic medical standards for evaluating patients and conducting medical examinations and keeping adequate records of treatments and diagnoses. He failed to conduct an adequate initial evaluation of any of these patients and failed to make an adequate record of an examination for any of these patients. He began treatment often without sufficient information about the patients' physical condition. "In many cases, [Dr. Geier] had no information at all about the Patients' physical conditions."

> For example, Dr. Geier treated Patient I for nine months without any physical examination and in fact without seeing him and without even documenting this patient's height and weight. He treated Patient B for almost three years without a physical examination and before ever seeing him, and he also treated Patient G without first physically examining him or even seeing him in person.

23

**(2)** Dr. Geier treated patients with Lupron, a medication that is not approved by the FDA in the absence of precocious puberty. He did not, however, perform an adequate examination to determine whether these patients had precocious puberty, or the cause of these patients' symptoms. For example, Dr. Geier failed in any patient to perform a left wrist X-ray, a necessary test used to determine if the patient suffers from precocious puberty. Without conducting an adequate physical examination, and based largely on information supplied by the parents, Dr. Geier prescribed nearly identical treatment for these patients regardless of the information provided by the parents. Dr. Geier, after having failed to perform an adequate physical examination or perform all of the necessary diagnostic tests, ordered an intensive regimen of therapy with powerful drugs without making any adequate notation in the medical record as to why he ordered such treatment.

**(3)** Based on his theory that Lupron therapy is appropriate in certain situations in which its administration is not approved by the FDA or the [AAP], Dr. Geier purported to treat patients who met his profile with Lupron. With the exception of Patient E, however, none of these patients met even Dr. Geier's profile for Lupron therapy.

**(4)** Dr. Geier prescribed chelation therapy to patients who failed to display the need for chelation. He began this therapy without documenting a reason for the treatment and without adequate documented informed consent. He violated the standard of quality care by so doing. He also violated the standard of quality care by prescribing for patients the drug DMPS, a drug not approved for any use in the United States.

**(5)** Dr. Geier provided a consent form to the parent of Patient I that named an FDA-approved drug and which falsely stated that it was to be used in the chelation treatment when another drug, DMPS, which was not FDA-approved, was to be used (and in fact was used) in the chelation treatment. Dr. Geier "failed to explain to the parents that the drug that he was asking them to insert into their children's rectums was not approved for use in the United States."

**(6)** After prescribing these treatments without an adequate previous medical examination and without adequate informed consent, Dr. Geier then failed to adequately monitor whether these treatments were working. His use of lab testing and intermittent reports from the parents was inadequate to assess the efficacy of treatment. He routinely ordered an extensive array of laboratory tests but failed to document any connection between these test results and his treatment plan. In patient A's case, Dr. Geier ordered a continuation of his treatment protocol even though Patient A was

24

permanently leaving for Nigeria, Dr. Geier had no way to monitor the patient, and Dr. Geier had not provided a referral to any physician who could.

(Footnotes omitted).

Dr. Geier's contention that the Board erred in finding that he violated the standard of care is limited to the argument that the Board erred in finding that he "violated the standard by failing to conduct physical examinations of patients."[8] In support, he argues that the Board incorrectly found "that a patient may only be prescribed Lupron if diagnosed with precocious puberty" and that he did not conduct an adequate physical examination to reach that diagnosis. He contends these findings were "legally incorrect" because a "diagnosis of precocious puberty is not required before a physician may lawfully administer Lupron 'off-label' to treat autism." Thus, Dr. Geier asserts, "the Board's conclusion that Dr. Geier violated the standard of care by failing to conduct physical examinations of patients must be reversed."[9]

The Board argues that "substantial evidence supports its finding that Dr. Geier failed to meet the standards for quality medical care." It notes, as we have recognized, that Dr. Geier does not challenge any of the Board's findings regarding his treatment. Rather, the Board asserts, Dr. Geier challenges findings that the Board never made (that he could not

---

[8] Dr. Geier does not challenge the Board's conclusion that he violated the standard of care by "providing the parents with inadequate or falsified consent forms, by failing to properly evaluate whether his treatment was working, by ordering continued therapy to a patient for whom there was no possibility of monitoring the effects, and by failing to keep adequate records."

[9] Dr. Geier asserts that the parties stipulated at the hearing before the ALJ that his "off-label use of Lupron was lawful and within the standard of care." That is not correct. The stipulation was that it was "not per se illegal" to use a drug "off-label."

25

prescribe Lupron unless a patient was diagnosed with precocious puberty), and he then argues that "he did not have to perform the evaluations necessary for a precocious puberty diagnosis because he was not prescribing Lupron for its 'on-label: use—to treat precocious puberty.'" The Board contends, in a footnote, that Dr. Geier has waived this argument because he did not raise it in the circuit court or in his exceptions to the ALJ's decision.

In any event, the Board argues, the medical records contradict the argument that Dr. Geier now raises because he "explicitly documented that he was using Lupron to treat precocious puberty, the 'on label' use for Lupron for children." It asserts: "The fact is Dr. Geier diagnosed his patients with precocious puberty, but he never performed the evaluations necessary for the diagnosis," and then he "treated his patients with Lupron under that diagnosis."

We agree with the Board that Dr. Geier's argument is devoid of merit. As we explain, there was substantial evidence to support the Board's conclusion that Dr. Geier failed to meet the standard of quality care required by HO § 14-404(a)(22) by "failing to properly evaluate patients before treating them with an intensive regimen of drug therapy."

The record supports the Board's conclusion that Dr. Geier diagnosed his patients with precocious puberty, but he did not perform the required evaluations to support that diagnosis, which was the purported basis to treat them with Lupron. Although Dr. Geier now asserts that he was not prescribing Lupron for its "on label" use, to treat precocious puberty, the record contradicts that argument. Dr. Geier explicitly documented that he was using Lupron to treat precocious puberty, the "on label" use for Lupron for children. With respect to Patient H, for example, he wrote to the patient's insurer:

26

> As a result of my findings, I have diagnosed [Patient H] with premature puberty (259.1) with evidence of pituitary dysfunction (253.9). In order to treat [Patient H's] conditions, I have prescribed Lupron therapy. The package insert for Lupron specifically recommends its administration for the treatment of premature puberty.

Because Dr. Geier's records state that he did prescribe Lupron for its "on-label" use, his assertion on appeal that he did not is unavailing.

Moreover, even with respect to the claim that Dr. Geier properly used Lupron "off-label" to treat patients for autism, the record supports the Board's finding that, with the exception of Patient E, none of the patients met the profile Dr. Geier said that he used. Dr. Geier testified that he initially evaluates his patients with severe symptoms of autism by ordering a large battery of tests, including laboratory tests. If the test results show that the child has one or more SNP on the MTHFR gene, low glutathione (an enzyme that assists the body to excrete mercury), and high testosterone, low levels of the hormone dehydroepiandrosterone sulfate ("DHEA-S"), high levels of DHEA, and the child has adverse behavioral signs of puberty, such as aggression and hypersexual behaviors, Dr. Geier offers the parent a two to three month trial of Lupron.

The evidence in the record supports the Board's finding that none of the patients, except Patient E, met the profile. Lab tests contrary to the profile included: (1) normal DHEA-S for Patient A; (2) low testosterone levels and normal glutathione Patient B; (3) normal glutathione for Patient F; (4) normal DHEA-S for Patient G and no signs of advanced puberty or aggression; (5) normal DHEA-S and glutathione for Patient H; and (6) normal DHEA-S for Patient I.

Accordingly, the record supports the Board's factual findings that Dr. Geier failed to properly evaluate patients before prescribing Lupron based on a diagnosis of precocious puberty, and he improperly treated patients "off-label" with Lupron based on a profile that he created, when the evidence showed the patients did not meet his profile. The facts support the Board's conclusion that Dr. Geier failed to meet the standard of care "[b]y failing to properly evaluate patients before treating them with an intensive regimen of drug therapy."

Moreover, as indicated, Dr. Geier does not contest the Board's other determinations supporting its conclusion that he violated the standard of care, i.e., "by providing the parents with inadequate or falsified consent forms, by failing to properly evaluate whether his treatment was working, by ordering continued therapy to a patient for whom there was no possibility of monitoring the effects, and by failing to keep adequate records." Accordingly, we conclude that there is more than substantial evidence to support the Board's conclusion that Dr. Geier failed to meet the standard for quality medical care.

**C.**

**Violation of HO § 14-404(a)(3)(ii)**

HO § 14-404(a)(3)(ii) prohibits a physician from engaging in "unprofessional conduct in the practice of medicine." In concluding that Dr. Geier violated this statute, the Board stated that Dr. Geier:

> [C]ommitted unprofessional conduct in the practice of medicine within the meaning of [HO] § 14-404(a)(3)(ii) when he had parents sign a consent form that falsely implied that he was conducting an experimental protocol approved by an [IRB] when in fact that review board was, as the ALJ put it, "a façade covering the intentions of a group that did not believe that they

28

were bound by federal or state law and had no intention of being so bound."[10]

He committed further unprofessional conduct when he had a parent sign a consent form for the use of one drug for chelation therapy when in fact another drug, a drug not approved for use in the United States, was intended to be used and was in fact used. His violations of the standard of care, especially his treating of some patients without examining them and his reaching diagnoses in the absence of required diagnostic tests, were so egregious as to amount to unprofessional conduct in themselves.

(Footnotes omitted).

Initially, we note that Dr. Geier, for good reason, does not challenge the Board's finding that he "had a parent sign a consent form for the use of one drug for chelation therapy when in fact another drug, a drug not approved for use in the United States, was intended to be used and was in fact used." The record reflects that, although the consent form for Patient I stated that the chelation agent utilized in the protocol was DMSA, an FDA approved medication, Dr. Geier admitted that "Patient I was treated with the mercury chelator DMPS," which is not approved by the FDA for use in the United States.

Rather, Dr. Geier's sole argument is that the Board erred in concluding that he committed unprofessional conduct when he had parents sign a consent form "that falsely implied that he was conducting an experimental protocol approved by an" IRB. The Board contends that substantial evidence in the record supports the Board's conclusion that Dr.

---

[10] The Board found as a fact that "Dr. Geier provided drug therapy to Patient I according to a protocol not approved by the FDA after telling the parent that his protocol was approved by an [IRB], when in fact the [IRB] consisted entirely of persons affiliated with his practice and did not meet the requirements of federal or state law."

Geier's representation to Patient I's parent that his experimental treatment was approved by an IRB was false and misleading because the IRB was a mere "façade."

The purpose of an IRB is to ensure that research planned is appropriately safe for patients involved in studies, and the patient has been properly notified of the risks of treatment. Under federal law, "[e]ach IRB shall include at least one member who is not otherwise affiliated with the institution and who is not part of the immediate family of a person who is affiliated with the institution." 45 C.F.R. § 46.107(d).

Dr. Geier raises two arguments why the Board's finding regarding the IRB was erroneous. First, he argues that, because there was no evidence that he conducted human research, there was no requirement to create in IRB. This argument, although raised below, is irrelevant because the Board's conclusion was that Dr. Geier "had parents sign a consent form that falsely implied that he was conducting an experimental protocol approved by an [IRB] when in fact that review board was, as the ALJ put it, "a façade covering the intentions of a group that did not believe that they were bound by federal or state law and had no intention of being so bound."[11]

Second, Dr. Geier argues that the Board erred in finding that the IRB "consisted entirely of persons affiliated with his practice and did not meet the requirements of federal or state law." He argues that, because "institution" is defined in 45 C.F.R. § 46.102(b) as a "public or private entity or agency," ICI, a corporation, not Dr. Geier, an individual, is

---

[11] In the exceptions Dr. Geier filed with the Board, he argued that, because an IRB was not required, "any inconsistency [that] existed as to its members . . . . was . . . not a violation of any statute or regulation governing IRB's."

the entity, and therefore, the applicable regulations do not impose any restrictions on a member's affiliation with Dr. Geier, unless the member is a family member of Dr. Geier's. Therefore, he argues, the Board's conclusion that the ICI IRB was improperly constituted, when only two members of the IRB were affiliated with the ICI, and at least four members were not affiliated with the ICI and were not family members, was a misinterpretation of the law.

Initially, this contention was not raised before the Board. Accordingly, it is not properly before this Court. *See County Council of Prince George's Cnty v. Billings*, 420 Md. 84, 110 (2011) ("[I]n an action for judicial review of an adjudicatory administrative agency decision, the reviewing courts should decline to consider an issue not raised before the agency.") (quoting *Motor Vehicle Admin. v. Shepard*, 399 Md. 241, 260 (2007)); *California Cartage Co. v. Nat'l Labor Relations Bd*, 822 F.2d 1203, 1207 n.6 (1987) (contention not raised before the Board is not properly before the court).

In any event, as noted, the Board's conclusion that Dr. Geier engaged in unprofessional conduct was not limited to its conclusion that Dr. Geier falsely implied that he was conducting an experimental protocol approved by an IRB when the IRB was a sham. Rather, this was only one of the determinations that led to that conclusion. The Board's conclusion also was supported by its finding that Dr. Geier "had a parent sign a consent form for the use of one drug for chelation therapy when in fact another drug, a drug not approved for use in the United States, was intended to be used and was in fact used," a finding not disputed by Dr. Geier. The Board further concluded that Dr. Geier's violations of the standard of care, "especially in his treating of some patients without examining them

31

and his reaching diagnoses in the absence of required diagnostic tests," were so egregious as to amount to unprofessional conduct *in themselves*." (Emphasis added). We previously have explained that the Board's findings regarding Dr. Geier's violation of the standard of care in this regard are supported by the record.

Accordingly, we need not reach the merits in the propriety of the Board's conclusions regarding the IRB. Even if the issue properly was before this Court, the Board's conclusion that Dr. Geier engaged in unprofessional conduct in the practice of medicine was supported by substantial evidence.

**D.**

**Violation of HO § 14-404(a)(11)**

HO Section 14-404(a)(11) prohibits a physician from "willfully mak[ing] or fil[ing] a false report or record in the practice of medicine. The Board concluded that Dr. Geier violated § 14-404(a)(11) by "willfully reporting false credentials when he applied for the renewal of his medical license." It based this conclusion on its factual finding that Dr. Geier "falsely stat[ed] that he was certified by" a recognized board of the ABMS "when he was not."

Dr. Geier contends that there was not "substantial evidence in the record demonstrating that [he] 'falsely stat[ed] that he was certified by an ABMS Board when he was not.'" He asserts that he was certified in 1987 by the American Board of Medical Genetics ("ABMG") as a "genetic counselor," that ABMG received ABMS approval in 1991, and although genetic counseling is "no longer offered" as a certified specialty, "there are many specialties that are grandfathered in that [the ABMG] no longer recognize[s]."

32

The Board contends that "substantial evidence supports [its] finding that Dr. Geier made a false record in the practice of medicine." It asserts that the evidence supports the Board's finding that "Dr. Geier had not been certified in the specific specialties that he wrote on his renewal forms."

The Board's renewal application asked applicants to "[l]ist up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA)." Dr. Geier answered "Genetics Medical" in 2006; "Genetics, Clinical [General]" in 2008; and "Genetics, Medical [Ph.D.]" and "Epidemiology" in 2010. Dr. Geier was not board-certified in any of these specialties.[12]

Given this evidence, there was substantial evidence in the record to support the Board's conclusion that Dr. Geier "falsely stat[ed] that he was certified by an ABMS Board when he was not." Accordingly, there was substantial evidence to support the board's conclusion that Dr. Geier violated HO § 14-404(a)(11) by "willfully mak[ing] or fil[ing] a false report or record in the practice of medicine.

### III.

### Admission of Dr. Grossman's Testimony

Dr. Geier next argues that the Board's expert, Dr. Linda Grossman, was not qualified to act as Dr. Geier's "peer" because she was not board-certified with "the

---

[12] Dr. Geier does not dispute that he was not Board certified in "Genetics, Medical" or "Genetics, Clinical." He was given the title of "fellow" by the American College of Epidemiology ("ACE"), which he asserts is the same as being board certified. Even if this assertion were persuasive, the ACE has never been recognized by the ABMS.

credentials in the field of [Dr. Geier's] certification and "has no significant knowledge of the cause or treatment of autism." Accordingly, he contends that she should not have been permitted to testify as an expert witness in the case.

The Board contends that "admission of the expert testimony of Dr. Grossman, who is board certified and has more than thirty years of experience in the relevant field, was not an abuse of discretion." It asserts that Dr. Geier's claim is "based on the falsehood that Dr. Geier was a "board-certified medical geneticist," which he was not. Moreover, it argues, Dr. Grossman did not need to have significant knowledge on the "cause" of autism because that was not the issue in the case. Rather, Dr. Grossman was offered to give an opinion on the treatment of pediatric patients with autism and related disorders, which she was qualified to do.

Generally, "'the admissibility of expert testimony is within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous.'" *Blackwell v. Wyeth*, 408 Md. 575, 618 (2009) (quoting *Wilson v. State*, 370 Md. 191, 200 (2002)). In an administrative proceeding, "the Board may make its own decisions about bias, interest, credentials of expert witnesses, the logic and persuasiveness of their testimony, and the weight to be given their opinions." *State Bd. of Physicians v. Bernstein*, 167 Md. App. 714, 761 (2006).

Dr. Grossman testified that she is a developmental behavioral pediatrician, and she is board certified in pediatrics and developmental behavioral pediatrics, a specialty that deals with developmental disabilities such as autism. She has more than thirty years of

34

experience diagnosing and treating children with neurodevelopmental disorders, including autism. The ALJ accepted Dr. Grossman as an expert in the following areas:

> Pediatrics, developmental behavioral pediatrics, diagnosis and treatment of children with neurodevelopmental disorders, including autism, generally medically accepted treatment for children with neurodevelopmental disorders, including autism, generally medically indicated conditions for chelation, pharmacology related to children with autism, psychopharmacology related to children with autism, interpretation of lab studies of children with autism, off-label use of drugs in the area of pediatrics, appropriate medical documentation, appropriate use of billing codes and use of diagnostic codes.

In addressing Dr. Geier's claim that Dr. Grossman was not a "true peer" and should not have been qualified as an expert, the Board found as follows:

> Dr. Grossman is board certified in pediatrics and developmental-behavioral pediatrics and has been an Associate Professor of Pediatrics, the Director of the Behavioral and Developmental Pediatrics Fellowship Program at the University of Maryland School of Medicine and the head of the Division of Behavioral and Developmental Pediatrics at that institution. She has also held many other positions of great responsibility in her 35-year career in pediatrics. She testified knowledgeably about the standard of care applicable to pediatric patients in general and to these patients in particular. The Board is satisfied that she was appropriately admitted as an expert in this case. The fact that she may not have been familiar with the details of some of Dr. Geier's idiosyncratic theories, theories that appear to be supported in large part by literature that he or his son created and which have been rejected to some extent by the Institutes of Medicine of the National Academy of Science, does not detract from the weight of her testimony about the quality of the actual medical treatment provided to these patients, in the Board's opinion.

We perceive no abuse of discretion by the Board in its finding that Dr. Grossman properly was qualified as an expert. Dr. Geier states no ground for relief in this regard.

35

**Exclusion of Dr. Geier's Proffered Exhibits**

Dr. Geier next argues that the ALJ and the Board erred when they excluded two exhibits that he wanted to admit into evidence. Specifically, he asserts error in the exclusion of his Exhibits 15 and 15A, which he asserts "conclusively demonstrate that [he] was board-certified by the ABMG." He acknowledges that the exhibits were not timely disclosed, but he asserts that, pursuant to the Code of Maryland Regulations ("COMAR") 10.32.02.04C(6), the ALJ and the Board could have admitted the exhibits because there were "unforeseen circumstances" that "prevented him from understanding the issue."

The Board contends that COMAR 10.32.02.04C(6) is inapplicable because this regulation does not address the admission of evidence, but rather, it "only allows a party, in the face of 'unforeseen circumstances which would otherwise impose an extraordinary hardship on a party,' to add a document to the *discovery list* after the discovery deadline." It does not allow a person to "bypass the discovery process entirely and have the documents, which were produced for the first time at the hearing, admitted directly into evidence." Moreover, the Board asserts, even if the regulation did apply, Dr. Geier cannot show unforeseen circumstances, as the letters purportedly were sent to Dr. Geier six months before the evidentiary hearing, and Dr. Geier "had ample notice of the issues in the case."

After hearing Dr. Geier's arguments regarding why he believed Exhibits 15 and 15A should be admitted, the ALJ concluded that Dr. Geier had "sufficient notice" that "anything that had to do with his credentials was going to be addressed in this hearing," and therefore, he "should have disclosed this document as a possible exhibit," but he failed to do so until

the fourth day of the hearing. The ALJ refused to admit the evidence because it was untimely.

Dr. Geier's only argument on appeal is that the exhibits were admissible under COMAR 10.32.02.04C(6). Dr. Geier, however, did not raise this argument to the Board in exceptions to the ALJ's ruling.[13] Accordingly, the argument is waived. *See California Cartage Co.*, 822 F.2d at 1207 n.6 (contention not raised before the Board is not properly before the court).

In any event, the claim is without merit. COMAR 10.32.02.04C sets forth the procedures for discovery in an administrative proceeding before the Board.[14] Section C(6) provides that, "[a]bsent unforeseen circumstances which would otherwise impose an extraordinary hardship on a party, witnesses or documents may not be added to the [discovery] list subsequent to" a prehearing conference if one is scheduled, or 15 days prior to the hearing, if one is not scheduled. COMAR 10.32.02.04C(6)(a) and (b). The prohibition against adding witnesses or documents subsequent to the prehearing conference does not apply to witnesses or documents to be used for impeachment or rebuttal. COMAR 10.32.02.04C(7).

Here, Dr. Geier did not seek to add Exhibits 15 and 15A to the discovery list. Rather, he sought to have documents, which were produced for the first time during the

_____

[13] In his exceptions to the ALJ's ruling, Dr. Geier's only mention of the ALJ's exclusion of the exhibits was in a footnote, and he made no particular argument regarding their admissibility. Nor did Dr. Geier cite to COMAR.

[14] At the time of the proceedings, COMAR 10.32.02.04(c)(6) was located at COMAR 10.32.02.03(e).

37

hearing, admitted directly into evidence. We perceive no abuse of discretion by the ALJ declining to admit the belatedly produced documents.

## V.

### Peer Review Reports

Dr. Geier next argues that the Board "failed to present evidence of two peer review reports," which are required before charging a physician with failing to meet the standard of care. *See* HO §§ 14-401(e)(1)(ii). He argues that the record here "discloses only a single reviewer," and there is "no evidence that there was a second peer review as required by Maryland law." Accordingly, he asserts that the "charges and findings which emanated under" HO §§ 14-404(a)(22) and (a)(40) are "fatally deficient and must be reversed."

The Board contends that this contention is devoid of merit for several reasons. First, it contends that, pursuant to HO § 14-405(g), Dr. Geier is "prohibited from alleging any defect in the pre-charge peer review process." Second, the Board argues that, "even if Dr. Geier's arguments were not precluded, [they] should be rejected" because the record as a whole demonstrates that the Board did obtain two peer review reports. These two reports included Dr. Grossman's report, which was "indisputably admitted into evidence," and Dr. Cely's report, which was offered into evidence but excluded after Dr. Geier objected to its admission on the basis that Dr. Cely was not available for cross-examination. Thus, the Board argues, there was substantial evidence that the Board, in fact, had obtained two peer review reports.

Finally, the Board argues that there is no provision in the Act requiring the Board to prove during the evidentiary hearing that it complied with the pre-charge peer review

38

procedure or that two peer review reports must be admitted into evidence. It asserts that requiring two peer review reports would serve no purpose because the testimony of only one expert witness constitutes substantial evidence.

We agree with the Board that Dr. Geier is not permitted to challenge any deficit in the pre-charge peer review process at this point in the proceedings. Section 14-401 of the Health Occupations Article describes the process by which claims are investigated. After the Board performs a preliminary investigation of an allegation of grounds for disciplinary or other action, it may refer the allegation for further investigation to an entity or individual for confidential physician peer review. HO § 14-401(c)(1)(i) and (e). For each allegation it refers for peer review, the Board "shall obtain two peer review reports." HO § 14-401(e)(1)(ii). The entity or individual peer reviewer with which the Board contracts has 90 days for completion of peer review. HO § 14-401(f).

In *Bd. Of Physician Quality Assur. v. Levitsky*, 353 Md. 188 (1999), the Court of Appeals explained:

> The role of the peer review process is much akin to that of the Attorney Grievance Commission process. Allegations of professional wrongdoing are referred to members of the profession – physicians in the one case, lawyers in the other – *to consider the allegations and determine whether they suffice to warrant the filing of charges*. The peer review panel does not determine whether the accused physician or attorney is 'guilty' of anything, *only whether there is a sufficient basis for the filing of charges*.

*Id.* at 206 (emphasis added).

HO Section 14-405(g) provides that "the hearing of charges may not be stayed or *challenged* by any procedural defects alleged to have occurred prior to the filing of

charges." (Emphasis added). In *Levitsky*, 353 Md. at 206, the Court of Appeals explained the scope of this statement:

> To the extent that deficiencies or irregularities in the pre-charge proceedings actually compromise the accused's opportunity for a full and fair hearing on the charges, in conformance with applicable Constitutional, statutory, or other legal requirements, or suffice in some way to deprive the agency (or court) of true jurisdiction to proceed, the accused is necessarily entitled, and must be allowed, to raise those deficiencies or irregularities, notwithstanding the statute or rule. Beyond that, however, the statute means what it says and must be given effect.

Here, even assuming arguendo, that there was not proof of two peer review reports, this did not deprive Dr. Geier of a full and fair hearing on the charges. Accordingly, he cannot challenge on appeal the alleged procedural defect in the charges.

## VI.

## Denial of Request to Supplement Administrative Record

Dr. Geier next argues that the circuit court erred in denying his motion to supplement the administrative record with a letter confirming the dates on which he was board certified by the ABMG, and to "order the [Board] to consider this evidence." He asserts that he had good reason for his failure to offer the letter into evidence during the administrative hearing, arguing that charges did not properly notify him of the Board's intention to dispute his board certification.

Maryland Code (2014) § 10-222(f) of the State Government Article provides:

> (f)(1) *Additional evidence. —* Judicial review of disputed issues of fact shall be confined to the record for judicial review supplemented by additional evidence taken pursuant to this section.
>      (2) The court may order the presiding officer to take additional evidence on terms that the court considers proper if:

(i) before the hearing date in court, a party applies for leave to offer additional evidence; and

(ii) the court is satisfied that:

1. the evidence is material; and

2. there were good reasons for the failure to offer the evidence in the administrative proceeding.

The Board contends that the circuit court properly denied Dr. Geier's request to supplement the record with a September 20, 2013, letter stating that he was certified in "Genetic Counseling" by ABMG in 1987 and this certification was revoked on October 26, 2011. It asserts:

> The letter was written over one year after the Board's decision and was in response to Dr. Geier's counsel's request dated September 16, 2013. . . . The circuit court appropriately rejected this letter. There is no dispute, and the administrative record already conclusively shows, that Dr. Geier was certified by ABMG as a "Genetic Counselor" in 1987. . . . And the revocation of Dr. Geier's genetic counseling certification in 2011 is not relevant because Dr. Geier's Board license renewal applications were filed in 2006, 2008, and 2010, and he did not state in any of these applications that his certification was in genetic counseling. The letter would have added nothing more to this case other than to further reconfirm that Dr. Geier misrepresented his credentials.

We agree. The circuit court did not abuse its discretion in denying the motion to supplement the record.

## VII.

## Denial of Motion for Stay

Dr. Geier's final argument is that the court erred when it denied his motion to stay the proceedings to allow him time to accumulate evidence from the discovery process in

41

an unrelated proceeding against the Board.[15]  He asserts that, during discovery in this unrelated proceeding, he "uncovered evidence that directly demonstrated bad faith, malice, and irregularities (*i.e.*, misconduct) committed by the Board and its members and the administrative prosecutor against Dr. Geier in this action."  He argues that, in denying his motion, the court "deprived Dr. Geier of the opportunity to demonstrate the improper actions of the Board."

The Board responds in several ways.  Initially, it argues that this Court should not consider this argument.   It states that, although Dr. Geier "mentions this issue," he "does not give any explanation as to why the circuit court erred in denying his motion other than to assert that he had 'uncovered evidence' of Board wrongdoing."  It notes that Dr. Geier does not identify any evidence of wrongdoing, and therefore, it contends that we should not consider this unsupported argument.

In any event, the Board argues that "the circuit court was within its broad discretion in denying Dr. Geier's motion for a stay."  It notes that the issue whether the Board was biased was raised in the circuit court for the first time on the day of argument, and it argues that, because the argument was not raised in the circuit court memorandum, the issue was waived.  It further asserts:

> Dr. Geier's motion rested largely upon an allegation issued at least 18 months before he filed his initial Rule 7-207 memorandum.  Dr. Geier, thus, cannot even complain that he did not have an opportunity to raise his argument in a timely manner.  Furthermore, Dr. Geier made no showing that any Board

---

[15] The motion stated that Dr. Geier and his family members filed a tort action against the Board due to the Board's unlawful disclosure of the Geier's private medical information.  He alleged that the Board acted maliciously against him in releasing this private medical information to the public.

member was even aware that the alleged medical information was in the purported cease and desist order when it was allegedly issued.

Finally, the Board argues that the motion sought a stay to allow Dr. Geier to present evidence such as a deposition transcript of a former Board member. It asserts that such evidence was protected by the Board's deliberative process privilege and was inadmissible in a judicial review proceeding.

The decision whether to grant a motion to stay a proceeding is within the discretion of the trial court, and it is reviewed for an abuse of discretion. *Bechamps v. 1190 Augustine Herman, LC*, 202 Md. App. 455, 460 (2011). *Accord Vaughn v. Vaughn,* 146 Md. App. 264, 279 (2002) ("Whether to grant or deny a stay of proceedings is a matter within the discretion of the trial court, and only will be disturbed if the discretion is abused."). The standard for finding an abuse of discretion is that "'no reasonable person would take the view adopted by the [trial] court' . . . . the trial court ruling was 'clearly against the logic and effect of facts and inferences before the court[ ] . . . or when the ruling is violative of fact and logic.'" *Fishman v. Murphy ex rel. Estate of Urban*, 433 Md. 534, 546 (2013) (quoting *Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 419 (2007)).

Here, the circuit court denied the motion to stay in a summary order, without specifying its rationale. Dr. Geier has failed to convince us that, under the circumstances here, the court abused its discretion in denying Dr. Geier's motion to stay the proceedings. Reversal is not warranted.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

43